Filed 11/14/23  In re K.V. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.V., a Person Coming Under the Juvenile Court Law. | B324749 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 22CCJP02091A |
| Plaintiff and Respondent, | |
| v. | |
| O.V., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charles Q. Clay, Judge.  Dismissed.

Allen Korenstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

Father appeals from the juvenile court's jurisdictional findings and orders declaring his then-16-year-old daughter K.V. a dependent of the court under Welfare and Institutions Code section 300, subdivision (b)(1).[1]  While this appeal was pending, the juvenile court returned K.V. to parents' custody and terminated its jurisdiction over K.V.  The Los Angeles County Department of Children and Family Services (Department) moved to dismiss father's appeal as moot.  As there is no relief we can provide father, and having concluded discretionary review is not warranted, we dismiss his appeal as moot.

**FACTUAL AND PROCEDURAL BACKGROUND**

The family consists of father, mother, and their children K.V. (born March 2006) and W.V. (born October 2010).[2]

1. ***The petition and investigation***

The Department became involved with the family when K.V.'s friend called the child protection hotline on May 24, 2022, after K.V. had come to her house and was afraid to return home.  K.V. had told the friend:  mother had kicked her legs and stomach during an argument earlier that month, giving her bruises on her legs; father and mother had hit her legs and chest in December 2021 and January 2022; a year earlier, mother had slammed K.V. into a table and hit her with one of the broken table legs, leaving K.V. with a bloody mouth and bruised legs and knees; mother had threatened to beat her to death; and

---

[1]  Statutory references are to the Welfare and Institutions Code.

[2]  Mother does not appeal, and W.V. is not a subject of this appeal.

2

parents had physically assaulted her younger brother W.V. with a belt.

The friend's mother took K.V. to a police station. There, K.V. told a social worker both parents beat her for discipline, but mother disciplined her more than father did. K.V. showed the social worker marks on the inside of her thigh that appeared to be bruises, which K.V. said mother had caused less than two weeks ago. K.V. said that, in summer 2021, she had left the house without permission to get sandwiches for her brother and herself. When her parents found out, she said they made her lie on the floor on her back—mother began hitting and kicking her and father hit her with a belt. K.V. also told the social worker she had stopped going to school in December 2021 after three other students beat her up. The school called her parents on May 25, 2022 to report her absences. K.V. said father called her and said, " 'You know what's going to happen' when you get home." K.V. took that to mean a "beating."

The social worker visited W.V. at his school. He said he "got spanked" a long time ago with a belt. When asked about the sandwich incident, he stated he did not see K.V. get spanked, but when she came downstairs, she looked "so sad."

The social worker spoke with father on the phone, and the investigating social worker interviewed him at the Department's office on May 25, 2022. He denied K.V.'s allegations of abuse. He admitted parents had spanked the children, but " 'only . . . on the legs and the ass.' " Father stated parents normally disciplined the children by talking to them, taking away their cell phones, and not taking them out to eat. He also admitted that when the children were "a lot younger[,] years ago[,] he might have spanked the children with a belt over clothing;

3

however, never to the extent of leaving marks or bruises on the children." Father said he last spanked K.V. eight months earlier when he hit her twice with a belt. He felt so bad about it that he apologized to her. Father stated he and mother "are not abusive and would never cause harm to the children."

As to specific allegations, father said the incident K.V. described about mother pushing her into a table never happened. He said mother may have spanked K.V. with an open hand on the thigh a couple of months ago when they found a boy hiding in her bedroom in the middle of the night. They were upset and called the police. They did not know how to react and "out of anger mother might have spanked [K.V.]." Father said mother did not cause any marks, bruises, or injuries. He did not know how K.V. got bruises on her legs. No one said anything about bruises when she went to swim practice.

Father believed K.V. was avoiding coming home because she did not "want to own up" to having skipped school and being caught with a boy in her room—she did not know how to face him or mother after she "betrayed their trust." Parents had learned she had not been attending classes since December. They were upset and frustrated and told K.V. she would have to face the consequences for her actions. K.V. then did not want to come home. Father said parents did not threaten to "beat her" or harm her. Father said he and mother had not had any contact with K.V. since May 19. She left school and they could not find her. Father filed a runaway/missing person's report at the police station.

During a phone call with the social worker, mother also denied abusing the children. Mother said she didn't understand why K.V. "would say such things except to cover up for her not

4

going to school." She stated she didn't remember what happened last summer with the sandwich incident "because she tries not to hold on to negativity." Mother said she last hit K.V. about three years ago when mother was drunk but apologized the next day.

The Department took K.V. into custody and placed her in foster care. K.V. told a forensic nurse that mother hit her with anything available—but mostly used a belt—and kicked her. She said father hit her with a belt and his hands and kicked her with his boots. The nurse observed a "pattern mark" on K.V.'s inner thigh that "was consistent with belt history." The mark was faded but had a "clear demarcation." Later, the nurse told the dependency investigator K.V. had said the mark had been bigger and happened a week earlier. The nurse stated children typically heal fast. She could not provide a possible date of when K.V. may have been hit with a belt to have caused the mark.

On May 31, 2022, the Department filed a section 300 petition alleging parents physically abused K.V. and that abuse also placed W.V. at risk. At the June 1, 2022 detention hearing, K.V.'s counsel joined with the Department in requesting K.V. remain detained from parents. The court detained K.V. from her parents and found visitation would be detrimental "at this point." The court asked for a "cooling off period" with no visits between K.V. and her parents pending the adjudication hearing. W.V. remained in parents' custody. Less than two weeks later, on June 11, 2022, K.V. ran away from her foster home. The court issued a protective custody warrant for her on July 14, 2022.

The Department's jurisdiction/disposition report, filed July 13, 2022, included the dependency investigator's separate interviews of the children and parents on June 15, 2022. K.V. said mother had begun physically abusing her about six years

ago. K.V. stated there had been several incidents, but she could not give the exact dates. K.V. again described the sandwich incident in 2021, explaining parents had physically abused her for leaving W.V. home alone—whom she was babysitting—to go out to buy sandwiches for them. K.V. said father saw her walking on the street, took her home, and physically disciplined her by kicking while wearing his work boots and slapping her. When mother returned home, she hit K.V. with the metal part of a belt and kicked her while she was on the floor. K.V. said she sustained bruises on her legs and was not allowed to leave the house until the bruises healed. As for the bruises observed on her thigh, K.V. said mother had hit her with a belt "a couple of weeks ago." K.V. had no concerns for W.V.'s safety, however. As for father, K.V. said he would hit her whenever mother physically abused her, but father did not physically discipline her as often as mother did. She denied witnessing father physically abuse W.V.

Mother denied physically abusing the children. She recalled physically disciplining K.V. once—when parents caught the teenage boy hiding in K.V.'s room. She said they called the boy's mother, not the police. Mother said she was very upset with K.V. and remembers spanking her "on the butt[,] over her clothes with an open hand." Mother denied using any objects to discipline K.V. or having observed any marks or bruises on K.V. after spanking her. Mother stated she alone disciplined K.V. during that incident; father told K.V. how disappointed they were in her behavior. Mother also denied physically abusing K.V. during the sandwich incident. Mother denied father physically abused K.V. and said he was more lenient with the children than she was.

Mother said K.V. had been having behavioral issues. Mother went to K.V.'s school on May 19, 2022 after receiving a call about her attendance. K.V. had attended only 84 of 165 days of school. The school staff could not find K.V., and K.V. would not answer mother's calls or texts. Mother said she filed a missing person's report.

Father said there was the one incident where mother spanked K.V.—when they found the boy in her room—but denied any other incident of physical abuse. He said mother spanked K.V. on her buttocks over her clothes and denied that she had used an object, like a belt or wire, to hit her. He again admitted that he and mother may have spanked the children when they were younger, but it was always over their clothes and never left any marks or bruises. Father denied he or mother physically disciplined K.V. during the sandwich incident. Father said he confronted K.V. on the street and had spoken to her about her behavior, as did mother, but they did not physically discipline her.

Neither parent knew where the marks on K.V.'s thigh came from.

W.V. denied any physical abuse by parents. He denied having ever seen mother or father physically discipline K.V. or having seen any marks or bruises on K.V. indicative of physical abuse. He had seen mother and K.V. only argue about K.V.'s grades and behavior in school and said father "would only talk to" K.V. when she misbehaved. W.V. said mother would take away their phones, tablets, and video games to discipline them. He felt safe in the home and had no concerns about his safety.

On August 25, 2022, K.V. went to the Department's office after having contacted the social worker. K.V. said she "was

ready to return home if possible." The Department placed K.V. with her paternal aunt. The court recalled the protective custody warrant and ordered a forensic interview of K.V.

K.V. completed the forensic interview on September 7, 2022. During the interview, K.V. admitted she had exaggerated the details of the physical abuse by her parents. K.V. told the interviewer everything that led to her running away started in October 2021. She was being harassed by another female student at school and started hiding in the bathroom instead of going to class. When the school notified her parents about her excessive absences, K.V. was afraid of getting in trouble and went to stay at a friend's house for about three days. She had told her friend her mother sometimes got physical with her. K.V. admitted to the interviewer the bruises on her leg were not from her parents but from working out at the gym and swimming. K.V. said she had felt pressure to lie from her friend—who was with her at the police station—and had panicked.

As for the sandwich incident, K.V. said mother had, for the first time, hit her with a belt. Father told mother to stop. K.V. told the interviewer father had not physically disciplined her then and denied father had physically disciplined her in the past. K.V. told the interviewer that everything else she had said about that incident was a lie—she "over exaggerated it so [she] wouldn't have [to] go back home so they would take [her] more serious [*sic*]." As for when parents found the boy in her bedroom, K.V. said mother slapped her and pulled her hair. When asked about father, K.V. told the interviewer, "He just talks, never hits me. He never does anything to me." K.V. told the interviewer she wanted to return home to her parents.

## 2.   *Adjudication*

The juvenile court held the continued adjudication hearing on October 5 and 6, 2022.  The court admitted the Department's reports and the forensic interview into evidence.  The Department's counsel acknowledged K.V. "seem[ed] to have walked back some of her statements" in her forensic interview but continued "to disclose being hit by mother."  Counsel also noted father had admitted giving spankings and had told the Department he last hit K.V. eight months before his interview and had apologized.  He also said mother had hit the child before.  The Department asked the court to sustain the petition as pleaded given K.V. "did not state that no physical abuse occurred, and . . . mother and father both admitted to some level of inappropriate discipline of [K.V.] when initially interviewed by the Department."

K.V.'s counsel stated K.V. wanted the court to know she would like the case to be dismissed and to return home to her parents.  Based on her statutory obligations, however, K.V.'s counsel joined with the Department.  Counsel told the court K.V. wanted the court to know her parents did not cause the bruises on her legs, she "overexaggerated" the abuse by her parents, and her father did not hit her.  Counsel noted K.V. acknowledged mother had been physically violent with her in the past.

Mother's counsel argued K.V. had "made very clear in her forensic interview that she was coached and pressured to make false allegations to the police.  She first told the police that she had no marks on her body.  She only later sa[id] bruising was from her parents because she felt pressures from others that were with her.  [K.V.] confirm[ed] that the bruising was never on account of any abuse from her parents."  Mother's counsel

9

noted mother had been "forthright about spanking [K.V.] with an open hand about a year or two ago when she caught her breaking house rules by sneaking a boy into the home." Counsel also noted W.V.'s statements corroborated the falsity of K.V.'s initial allegations of abuse. Counsel asked the court to dismiss the petition and also argued there was no current risk to K.V., noting K.V. wanted to go home.

Father's counsel also asked the court to dismiss the petition. Counsel argued, "This is not a case of a child being physically abused. This is a case of a teenager who was caught with a boy in her room under her bed, skipping school daily and generally misbehaving and thinking that she was older than she is. [¶] [K.V.] got caught, and she didn't like it. She spun a fanciful tale of years of abuse that are not backed up by any collaterals or any other evidence." Counsel noted K.V. said her friend told her to say her bruises were from her parents—when they really were from the gym and swimming—so K.V. would not have to return home. K.V. noted she felt pressure from the friend to maintain the lie because she was not interviewed privately at the police station. Counsel also noted other inconsistencies in K.V.'s stories. For example, she told the forensic interviewer her bruise was from being hit with a belt one week earlier but told the police officer it was from being kicked two weeks earlier. Counsel also noted K.V. originally claimed there had been several instances of abuse in 2021 and 2022 when she had bruises, and once a bloody mouth, yet the family had no prior referrals to the Department. And, K.V. originally said father would hit her when mother physically abused her, "yet here today [K.V.'s] attorney has made it clear that [K.V.'s] father has not hit her." Father's counsel also argued she found "it extremely difficult to believe"

10

K.V.'s 11-year-old brother "would have no indication that this abuse was occurring and that he would not see any bruises or any marks on his sister on a regular basis."

Father was willing to participate in conjoint counseling with K.V. He "just want[ed] his family back together," as K.V. "had made clear" she also wanted.

After hearing argument, the court sustained one count of the petition under section 300, subdivision (b)(1), amended to read:

> "[K.V.] and [W.V.'s] father . . . used inappropriate physical discipline on the child [K.V.] [¶] In 2021, the father struck the child with a belt multiple times. On prior occasions, the father struck the child's legs and buttocks. The child refuses to return home due to the physical abuse by her father. [¶] Such physical abuse was excessive and caused the child unreasonable pain and suffering. The inappropriate physical discipline of the child [K.V.] by the father endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and physical abuse."

The court found K.V.'s statements were "inherently not reliable, given her recantation of certain facts alleged." The court sustained the single count against father "based on the corroboration given by father." The court found there was no corroboration, however, "of any inappropriate physical discipline or abuse by mother, nor of any as to [W.V.]." The court thus dismissed the counts as to W.V., the allegations against parents

11

as to any conduct toward W.V., and the allegations as to mother's failure to protect.

The court declared K.V. a dependent of the juvenile court, ordered her removed from parental custody and placed with paternal aunt, ordered monitored visitation and family reunification services for parents, ordered K.V. to participate in counseling and each parent to participate in conjoint counseling with K.V. when recommended by K.V.'s therapist, and ordered each parent to participate in individual counseling. The court set the case for a six-month review hearing on April 6, 2023. Father's counsel filed a notice of appeal on father's behalf on October 10, 2022.

### 3.    *Post-appeal developments*

On April 6, 2023, the juvenile court found "the extent of progress made toward alleviating or mitigating the causes necessitating placement" by both mother and father had "been substantial." The court terminated the suitable placement order and ordered K.V. returned to parents' custody. Less than three months later, on June 28, 2023, the court found the conditions that justified the initial assumption of jurisdiction under section 300 no longer existed and were "not likely to exist if supervision [were] withdrawn and the Court terminate[d] [its] jurisdiction." The court terminated its jurisdiction and noted a Juvenile Custody Order was unnecessary as K.V. already had been released to parents.

Father filed his opening brief on June 13, 2023. He argued the evidence did not support the jurisdictional finding of inappropriate physical discipline, citing parents' right reasonably to discipline their children, and arguing there was no evidence K.V. ever suffered serious physical harm at father's hands—

12

there was no evidence father caused any bruising, father showed remorse for his actions, and father's concern for K.V.'s behavior was a reason to discipline her. (Citing *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 91–92 [parental disciplinary privilege requires "(1) a genuine disciplinary motive; (2) a reasonable occasion for discipline; and (3) a disciplinary measure reasonable in kind and degree"; and finding use of wooden spoon to administer a spanking did not "necessarily exceed[ ] the bounds of reasonable parental discipline"] and *In re D.M.* (2015) 242 Cal.App.4th 634, 637 [reversing juvenile court's finding mother's spanking of children on buttocks with hand or sandal was categorically unreasonable discipline and remanding for court to apply three-part test].)

With its respondent's brief, the Department filed a motion to dismiss father's appeal as moot and asked us to take judicial notice of the court's April 6 and June 28, 2023 minute orders. The Department alternatively argued substantial evidence supported finding the "amount of punishment" father gave K.V. was "unreasonable and excessive under the circumstances," and until father "ameliorated the risk of harm to [K.V.]," the juvenile court's findings were supported by the evidence.

Father did not file an opposition to the Department's motion to dismiss or request for judicial notice. And, although we granted father a 10-day extension to file his reply brief, he did not file one.[3] We now take judicial notice of the juvenile court's

---

[3] Father's counsel sent a letter—filed October 9, 2023—stating he had been ill and unable to file the letter by the extended reply due date. Counsel noted father's "children [had been] returned to him . . . and jurisdiction is now terminated."

April 6 and June 28, 2023 minute orders.  (Evid. Code, §§ 452, subd. (d), 459.)

**DISCUSSION**

1.    *Father's appeal is moot*

As our high court recently reiterated:

> "A court is tasked with the duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." '  [Citation.]  A case becomes moot when events ' "render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." '  [Citation.]  For relief to be 'effective,' two requirements must be met.  First, the plaintiff must complain of an ongoing harm.  Second, the harm must be redressable or capable of being rectified by the outcome plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*) [mootness rule applies in dependency context].)

We must " ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [our] decision would affect the outcome in a subsequent proceeding." ' " (*D.P., supra*, 14 Cal.5th at p. 276.)

---

Father submitted the matter to the court based on his opening brief.

"[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60, quoted by *D.P.,* at p. 276.) "[R]elief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.' " (*D.P.*, at p. 277, quoting *In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.)[4] Thus, "to show a need for effective relief, the plaintiff must first demonstrate that he or she has suffered from a change in legal status." (*D.P.*, at p. 277.)

Father's appeal is moot. K.V. no longer is a dependent of the juvenile court, and she was returned to his and mother's joint custody without any changes to or restrictions on his custodial rights. Indeed, the court entered no custodial order. We thus can give father no effective relief.

## 2. *We decline to exercise our discretion to review the merits of father's appeal*

"Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P., supra*, 14 Cal.5th at p. 282.) Generally, that discretion is exercised "when 'the case presents an issue of broad public interest that is likely to recur,' 'when there may be a recurrence of the controversy between the parties,' or 'when a material question remains for the court's determination.' " (*Ibid.*)

Our high court has recognized several "features of dependency proceedings may make appeals particularly prone to mootness problems." (*D.P., supra*, 14 Cal.5th at pp. 284–285.)

---

[4] *D.P.* overruled *In re I.A.* in part on another ground. (*D.P., supra*, 14 Cal.5th at p. 283.)

15

And, "[b]ecause dismissal of an appeal for mootness operates as an affirmance of the underlying judgment or order [citation], such dismissals may ' "ha[ve] the undesirable result of insulating erroneous or arbitrary rulings from review." ' " (*Id.* at p. 285.) Thus, appellate courts may consider a variety of factors in "opt[ing] to exercise their inherent discretion to decide certain challenges to juvenile court jurisdictional findings, notwithstanding mootness." (*Ibid.*)

For example, courts may consider whether challenged jurisdictional findings could prejudice the parent, potentially affect the current or future dependency proceedings, or have other consequences for the parent beyond jurisdiction. (*D.P., supra*, 14 Cal.5th at p. 285.) Our high court also noted "[t]he exercise of discretionary review may . . . be informed by whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct. [Citations.] Though stigma alone will not sustain an appeal, a court may consider the nature of the allegations against the parent when deciding whether discretionary review is proper. The more egregious the findings against the parent, the greater the parent's interest in challenging such findings." (*Id.* at pp. 285–286.) A court "may also consider why the appeal became moot"—such as when "the case becomes moot due to prompt compliance by parents with their case plan"—as "[i]t would perversely incentivize noncompliance" if appeals from jurisdictional findings were available "only for parents who are less compliant or for whom the court has issued additional orders." (*Id.* at p. 286.)

The court explained that while "no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal," a court ultimately

16

"should be guided by the overarching goals of the dependency system" in deciding whether to exercise that discretion. (*D.P.*, *supra*, 14 Cal.5th at p. 286.) As the court directed, a reviewing court thus "must decide on a case-by-case basis whether it is appropriate to exercise discretionary review to reach the merits of a moot appeal." (*Id.* at p. 287.) Having considered the above principles and factors discussed in *D.P.*, we decline to exercise our discretion to reach the merits of father's appeal.

This case does not present an issue of broad public interest and there is nothing to suggest the controversy will recur. Moreover, father did not oppose the Department's motion to dismiss his appeal as moot, nor file a reply brief to articulate any prejudice, stigma, or adverse consequences he is facing, or will face, if the court's ruling is left unreviewed. Indeed, father's counsel's belatedly-filed letter states he would not be submitting "any additional argument." Father thus has not offered any reason why we should consider the appeal now that K.V. has been returned to his and mother's custody and dependency jurisdiction has been terminated. We find none.

The court here dismissed the petition's allegations under section 300, subdivision (a)—that father had intentionally caused, or may intentionally cause, K.V. serious physical harm. The sustained count accused father of inappropriately disciplining K.V. by striking her with a belt in 2021 and striking K.V.'s legs and buttocks on other occasions, but father had admitted that conduct. The court also struck the allegation that father had physically abused K.V., finding instead that his inappropriate physical discipline of her "endanger[ed] [K.V.'s] physical health and safety and place[d] the child at risk of serious physical harm, damage, and physical abuse."

Accordingly, we do not find the jurisdictional findings here were based "on particularly pernicious or stigmatizing conduct" that would weigh heavily in favor of our review. (*D.P., supra*, 14 Cal.5th at pp. 285–286.) And, although father eliminated the need for continued jurisdiction after the first review hearing—a factor weighing in favor of discretionary review—"no single factor is necessarily dispositive of whether a court should exercise discretionary review of a moot appeal." (*Id*. at p. 286.)

On balance, after considering all the pertinent factors and the totality of the evidence in the record—and having heard no objection from father—we conclude discretionary review of father's moot appeal is not warranted.

## DISPOSITION

The appeal is dismissed as moot.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.

18